IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 12, 2024 Session

FILED
FEB 25 2025
Clerk of the Appellate Courts
REc'd By_____

## IN RE LIBERTY T.

Appeal from the Chancery Court for Hawkins County
No. 2020-AD-19          Douglas T. Jenkins, Chancellor

---

### No. E2023-01512-COA-R3-PT[1]

---

This is the second appeal in this action involving a petition to terminate the mother's parental rights to her child and to allow the petitioners to adopt the child. In the first appeal, the petitioners challenged the trial court's determination that despite establishment of a statutory ground for termination, the petitioners had failed to demonstrate that termination of the mother's parental rights was in the child's best interest. This Court affirmed the trial court's finding as to the statutory ground. However, concluding that the trial court had erred by applying an outdated set of statutory best interest factors, this Court reversed the trial court's judgment and remanded for consideration of the updated factors. On remand and following an evidentiary hearing, the trial court confirmed its previous determination that the petitioners had failed to demonstrate clear and convincing evidence that termination of the mother's parental rights would be in the child's best interest. Accordingly, the trial court dismissed the petition. The petitioners have appealed, and the mother has raised an additional issue regarding the statutory ground for termination. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Keith A. Hopson, Kingsport, Tennessee, for the appellants, Julie T. and Timothy T.

John S. Anderson, Rogersville, Tennessee, for the appellee, Faith E.[2]

---

[1] In an order entered on November 16, 2023, this Court consolidated the record in the previous appeal of this case, No. E2022-00307-COA-R3-PT, with the record in the instant appeal.

[2] Upon a motion filed by the appellee's counsel, this Court granted counsel leave to not appear for oral argument.

# OPINION

## I. Factual and Procedural Background

This case focuses on Liberty T., the minor child ("the Child") of Faith E. ("Mother") and Andrew T. ("Father"). The petitioners are Father's parents, Timothy T. ("Grandfather") and Julie T. ("Grandmother") (collectively, "Grandparents"). In the first appeal, this Court set forth the following pertinent factual and procedural history:

> Mother and Father were never married. The Child was born in Pennsylvania in June 2018, and within a month after her birth, the parents and the Child relocated to Tennessee. Mother testified at trial that Father, the Child, and she initially stayed with [Grandmother] and that Mother then stayed for a time with [Grandfather]. Mother acknowledged during trial that the Child had remained in what Mother referred to as Grandmother's temporary custody since July 2018. Mother and Father ended their relationship in December 2018. . . . Grandmother testified that at the time of trial, she resided in an apartment in Church Hill, Tennessee, with the Child and Grandparents' eighteen-year-old daughter, B.T., while Grandfather resided during the week in the same town at a home that Grandparents were in the process of remodeling. Grandmother further testified that Grandparents planned to live together full time in the remodeled home with the Child and B.T. when the home was finished.
>
> On September 20, 2018, the Department of Children's Services ("DCS") filed a petition in the Hawkins County Juvenile Court ("juvenile court"), alleging dependency and neglect against the parents and requesting that temporary legal custody of the Child be transferred to Grandmother. DCS averred that in response to a referral alleging that the Child had been exposed to drugs, DCS had investigated the parents in August 2018. DCS alleged that the investigation revealed concerns of domestic violence between the parents and a need for mental health treatment for both parents, specifically as to Mother in response to her statement made to the investigator that she had been diagnosed with bipolar disorder and anxiety. DCS also averred that the parents could not continue residing with Grandmother because they were not on her lease and that during a child and family team meeting, the parents had agreed to allow Grandmother "to assume custody of the child until such time as they could obtain safe and stable housing and work with their service providers."

Following a hearing during which each of the parents respectively stipulated that the Child was dependent and neglected, the juvenile court entered an order on February 26, 2019, adjudicating the Child dependent and neglected and directing that the Child would remain in Grandmother's custody and the juvenile court's protective jurisdiction. The juvenile court further ordered that the parents would be allowed separate supervised visitation with the Child and that each parent would be required to complete the following responsibilities before he or she would become eligible to regain custody of the Child: (1) obtain and maintain stable and safe housing and (2) follow all recommendations stemming from a clinical parenting assessment. Mother subsequently completed a psychological assessment in October 2018, which was presented as an exhibit during the termination trial.

On February 18, 2020, upon an emergency telephone request from the Child's guardian *ad litem* ("GAL"), attorney Deborah A. Yeomans-Barton, the juvenile court entered an *ex parte* order, requiring that Mother's visitation with the Child would occur on Saturdays from 10:00 a.m. to 4:00 p.m., would be supervised, and would be outside the presence of Mother's boyfriend at that time, C.M. The juvenile court also ordered Father's visitation to occur at Grandmother's home under her supervision and at her discretion and ordered both parents "to submit to psychological testing as set up by [DCS]." In the meantime, Mother had given birth to a second daughter, K.M., in March 2020, and upon a petition filed by DCS, the juvenile court entered an order in August 2020, adjudicating K.M. dependent and neglected as to her biological father, C.M. The juvenile court, while directing that K.M. would remain in the court's protective jurisdiction, placed K.M. in the sole custody of Mother and directed that C.M. was to have no contact with K.M.

On April 23, 2020, Grandparents filed in the Hawkins County Chancery Court ("trial court") a petition for adoption of the Child and petition to terminate Mother's and Father's parental rights to the Child. As to Mother, Grandparents alleged statutory grounds of (1) abandonment through failure to financially support the Child in the four months preceding the filing of the termination petition, pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), and (2) failure to manifest an ability and willingness to assume legal and physical custody of the Child pursuant to Tennessee Code Annotated § 36-1-113(g)(14). Grandparents also alleged that termination of Mother's and Father's parental rights would be in the best interest of the Child. The trial court subsequently appointed Ms. Yeomans-Barton to continue as the Child's GAL.

- 3 -

Upon Mother's filing of an affidavit of indigency, the trial court appointed counsel to represent her. Mother filed an answer to Grandparents' petition on June 29, 2020, denying that statutory grounds existed to terminate her parental rights and denying that such termination would be in the Child's best interest. As pertinent on appeal, Mother asserted as an affirmative defense that any failure on her part to financially support the Child was not willful. According to Mother's affidavit of indigency, she was employed full-time at a Hardee's restaurant in April 2020. Mother subsequently testified at trial that she was employed at Hardee's from July 2018 through August 2020 and was later employed for a few months at a Love's Travel Stop.

Grandparents filed a motion to amend their petition and file a supplemental pleading on July 9, 2021. In their "Supplemental Petition to Terminate Parental Rights," Grandparents, *inter alia*, alleged an additional statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Although relying on essentially the same factual allegations, Grandparents also amended their contention that termination of Mother's and Father's parental rights would be in the best interest of the Child to incorporate the expanded best interest factors contained in the April 2021 amendment to Tennessee Code Annotated § 36-1-113(i). *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). Mother filed an answer to the supplemental petition, denying all substantive allegations. Grandparents then filed an "Amended Petition to Terminate Parental Rights" on August 6, 2021, still alleging the same three statutory grounds and best interest allegations against Mother, and Mother filed an answer to the amended petition.

Following a hearing, the trial court entered an order on September 8, 2021, allowing Grandparents to file their supplemental petition. After subsequent hearings, the trial court entered three separate orders on December 21, 2021, *inter alia*, allowing Grandparents to amend their termination petition, denying three separate oral motions made by Mother to dismiss the termination petition, setting forth a schedule of weekly supervised visitation for Mother with the Child, and setting forth unsupervised holiday visitation for Mother with the Child to occur in a public place.

The trial court conducted a bench trial on January 10, 2022. As noted by the trial court in its final order, the parties clarified at the beginning of

trial that Grandparents were pursuing only two statutory grounds against Mother: (1) abandonment through failure to financially support the Child and (2) persistence of the conditions leading to the Child's removal from Mother's custody. Father indicated at trial that he would voluntarily surrender his parental rights if Grandparents were successful in their action against Mother. Grandparents called Mother as an adverse witness, and Grandmother and Grandfather each testified. Grandparents also presented testimony from Heather Click, a nurse who had provided in-home support and education to Mother through the East Tennessee Nurse Family Partnership, and Tracy Burke, a Court Appointed Special Advocate ("CASA") volunteer who had worked on the Child's case since October 2019.

At the close of Grandparents' proof, Mother's counsel moved to dismiss the termination petition against Mother for failure to prove clear and convincing evidence of either statutory ground. After hearing closing arguments, including the GAL's recommendation that termination of parental rights would not be in the Child's best interest, the trial court ruled orally from the bench, subsequently incorporating its transcribed ruling into a written order of dismissal.

The trial court entered its initial order of dismissal on February 7, 2022, determining that Grandparents had proven the statutory ground of failure to support by clear and convincing evidence but that they had failed to prove the ground of persistence of conditions by clear and convincing evidence. Applying the statutory best interest factors applicable to the date of the original petition's filing, *see* Tenn. Code Ann. § 36-1-113(i) (Supp. 2020), the court further found that Grandparents had failed to prove by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

In entering an amended order of dismissal on March 2, 2022, the trial court added findings to its analysis of the best interest factors, primarily clarifying how the court had weighed each factor. The trial court directed that Mother's parental rights to the Child "shall remain completely intact," divested itself of further jurisdiction, and remanded the case to the juvenile court as "the court of original jurisdiction." Grandparents timely appealed.

*In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *1-3 (Tenn. Ct. App. Mar. 29, 2023) ("*Liberty I*") (footnotes omitted).

In *Liberty I*, this Court affirmed the trial court's determination that Grandparents had proven by clear and convincing evidence that Mother had abandoned the Child by failing to financially support her in the four months preceding the initial termination petition's filing. *Liberty I*, 2023 WL 2681897, at *8. However, this Court reversed the trial court's determination regarding the Child's best interest upon concluding that the trial court had applied the wrong version of the statutory best interest factors provided in Tennessee Code Annotated § 36-1-113(i). *Liberty I*, 2023 WL 2681897, at *10 (explaining that because Grandparents had raised a new termination ground and "refashioned their allegations concerning the Child's best interest" in the amended petition, the version of the statute in effect when the amended petition was filed governed the best interest analysis). In remanding to the trial court for consideration of the applicable factors, this Court recognized that "'time has marched on during this litigation'" and directed that "[a]t its discretion, the trial court may therefore consider additional evidence." *Id.* at *11 (quoting *In re Disnie P.*, No. E2022-00662-COA-R3-PT, 2023 WL 2396557, at *14 (Tenn. Ct. App. Mar. 8, 2023)).

On remand, the trial court conducted a hearing on August 16, 2023. The court instructed the parties that although it would not be retrying the case, the court would hear any additional proof the parties wished to present regarding the time span between the termination trial in January 2022 and the hearing on remand. Grandmother was the sole witness during the hearing, stating in part that Mother had made no child support payments to Grandparents since the termination trial. Grandmother also testified regarding Mother's visits with the Child since January 2022, which Grandmother described as "sporadic."

On September 15, 2023, the trial court entered findings of fact and conclusions of law based on the applicable best interest factors. The court stated that "no new findings of fact [were] necessary" and that the proof presented during the August 2023 hearing did "not change any of the Court's previous findings." After analyzing the best interest factors, the court concluded that "the factors in favor of termination do not overcome the factors against termination" and confirmed its prior determination that termination of Mother's parental rights was not in the Child's best interest. The court subsequently entered an "Order of Dismissal" on October 3, 2023, incorporating its findings of fact and conclusions of law, as well as its March 2022 dismissal order with accompanying findings of fact and conclusions of law. The court divested itself of further subject matter jurisdiction in the matter to "return[] all further issues concerning" the Child to the Hawkins County Juvenile Court ("juvenile court") as the court with original jurisdiction. Grandparents timely appealed.

## II. Issues Presented

Grandparents present one issue on appeal, which we have restated as follows:

1.      Whether the trial court erred by finding that Grandparents had failed to present clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest and thereby erred by declining to terminate Mother's parental rights to the Child.

Mother presents an additional issue, which we have similarly restated as follows:

2.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground that Mother had failed to financially support the Child in the four months preceding the filing of the petition.

III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(i)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating

parental rights is *"final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky,* 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.,* 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky,* 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.,* 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.,* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.,* 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.,* 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596-97.

*In re Carrington H.,* 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.,* 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Ground of Abandonment Through Failure to Support

Mother contends, as she did during her first appeal, that the trial court erred by finding clear and convincing evidence that she had failed to financially support the Child during the four months immediately preceding the filing of the original termination petition in April 2020. *See* Tenn. Code Ann. § 36-1-113(g)(1) (West March 6, 2020, to current);

Tenn. Code Ann. § 36-1-102(1)(A)(i) (West March 6, 2020, to June 30, 2021). Mother does not refer to this Court's affirmance in *Liberty I* of the trial court's determination regarding this statutory ground for termination of Mother's parental rights. *See Liberty I*, 2023 WL 2681897, at *8 ("We therefore affirm the trial court's determination that Grandparents proved the statutory ground of abandonment by failure to support by clear and convincing evidence."). Mother presents no rationale for urging this Court to revisit the issue.

As this Court has previously explained:

> "The law of the case doctrine 'generally prohibits reconsideration of issues that have already been decided in a prior appeal of *the same case.*'" *In re Bridgestone/Firestone*, 495 S.W.3d 257, 266 (Tenn. Ct. App. 2015) (quoting *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998)). In other words, a court will generally refuse to reconsider an issue that has already been decided by the same court in the same case. *Id.* (quoting 36 C.J.S. *Federal Courts* § 602 (2015)). This discretionary rule of judicial practice is based on the common sense recognition that issues previously litigated and decided need not be revisited. *Id.* An appellate court's decision on an issue of law will be binding in later appeals of the same case if the facts on the subsequent appeal are substantially the same as those in the first appeal. *Id.* However, a redetermination of a previously decided issue may be justified (1) when the evidence offered following remand is substantially different from the evidence in the earlier proceeding; (2) when the prior decision was clearly erroneous and would result in manifest injustice if allowed to stand; or (3) when the prior decision is contrary to a change in the controlling law which occurred between the first and second appeal. *Id.*

*In re Neveah W.*, 525 S.W.3d 223, 236 (Tenn. Ct. App. 2017). Mother has presented no argument to justify revisiting this issue, and none of the above-listed grounds would support a redetermination. *See id.* Therefore, we conclude that the law of the case doctrine prohibits our reconsideration of this statutory ground for termination.

## V. Best Interest of the Child

When, as here, a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear

and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

As found applicable by this Court in *Liberty I*, 2023 WL 2681897, at *10, the trial court on remand analyzed the following best interest factors provided in Tennessee Code Annotated § 36-1-113(i)(1) (West April 22, 2021, to current), which was in effect when the amended termination petition was filed:

(A)     The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

As our Supreme Court has explained regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

- 12 -

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The trial court dismissed Grandparents' petition upon concluding that the statutory factors weighed in favor of maintaining Mother's parental rights to the Child. In its findings of fact and conclusions of law on remand, incorporated into its final dismissal order, the court also incorporated its initial findings regarding the "old" factors from its March 2022 dismissal order and stated the following concerning the updated factors:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority. This is similar to the old factor #5. Changing care takers troubles the Court, and in that regard this factor weighs in favor of termination. However, the Mother has a close relationship with the child. The child's Guardian ad Litem strongly opposes termination. Mother deserves a chance and this factor, under the circumstances, does not weigh in favor of termination to such a degree that termination is mandated.

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical

condition. This factor is also similar to the old factor #5 and weighs in favor of termination.

(C)     Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. This factor, in the past, has weighed in favor of termination but at the time of the initial hearing, Mother had made such great progress that the factor no longer weighs in favor of termination.

(D)     Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment. As the Court noted previously, Mother's relationship is more of a friend but is a close and loving relationship. This factor weighs against termination.

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child. This factor weighs against termination.

(F)     Whether the child is fearful of living in the parent's home. This factor weighs against termination.

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms. This factor weighs against termination.

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent. This factor weighs in favor of termination. [Grandparents] have an extremely close and loving relationship with the child.

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage. This factor weighs against termination. The grandparents will be in the child's life in some form or fashion even if termination does not occur.

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent; or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner. This factor is similar to old factor #7. The Court's findings are the same as with old factor #7 and this factor weighs in favor of termination.

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct or conditions. This case does not involve "the department" at this time, but the D.C.S. was involved early on and Mother took advantage of their offerings according to witness Burke. This is similar to old factor #2, and the Court's findings from old factor #2 are adopted herein. This factor presently weighs against termination[.]

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department. This case does not involve "the department" at [this] time.

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest. This factor presently weighs against termination.

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult. This is similar to the old factor #6, and this factor weighs in favor of termination.

(0)     Whether the parent has ever provided safe and stable care for the child or any other child. This factor weighs against termination.

(P)    Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive. This factor presently weighs against termination.

(Q)    Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. This factor presently weighs against termination.

(R)    Whether the physical environment of the parent's home is healthy and safe for the child. This factor weighs presently against termination.

(S)    Whether the parent has consistently provided more than token financial support for the child. This factor weighs in favor of termination.

(T)    Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. This factor presently weighs against termination.

In sum, the court found that six factors weighed in favor of terminating Mother's parental rights, thirteen factors weighed against termination, and one factor, (L), was inapplicable. Concluding that the proof taken during the hearing on remand did not affect its previous findings, the court determined that "the factors in favor of termination do not overcome the factors against termination." The court determined that it could not find "under this proof that [it was] in the child's best interest that termination and adoption occur."

On appeal, Grandparents acknowledge that factor (L) (whether DCS had made reasonable efforts to assist Mother) was inapplicable because the Child was not in DCS custody. Grandparents contend that the trial court erred by declining to weigh all applicable factors in favor of terminating Mother's parental rights to the Child, and they argue that two factors, (F) and (G), should have been found inapplicable. In her appellate brief, Mother asserts that the trial court erred by declining to weigh all statutory factors in favor of maintaining her parental rights. However, as in the first appeal, Mother addresses only the nine best interest factors included in the prior version of the statute.[3] We note that

---

[3] The prior version of the statute provided the following nine factors for consideration in the best interest analysis:

the prior best interest factors "are included in the new version of factors that went into effect in April 2021." *See In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022). Thus, although we find Mother's argument to be incomplete in addressing the expanded best interest factors, we will still consider it.[4]

The trial court found that factors (A), (B), (H), (J), (N), and (S) weighed in favor of terminating Mother's parental rights to the Child. However, regarding factor (A)—the Child's need for stability and continuity of placement—the court found that the factor "does not weigh in favor of termination to such a degree that termination is mandated." The court compared factor (A) to "the old" factor (5), which involved the effect a change of caretakers and physical environment would have on a child. As Grandparents emphasize on appeal, in its March 2022 dismissal order, the court found the old factor (5) to be "extremely persuasive in favor of termination" because the "change of caretakers and physical environment could have a great and upsetting effect on the child." Accordingly, the trial court found factor (B), which expressly involves the effect a change of caretakers

---

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020, to April 21, 2021).

[4] Mother was represented by her trial counsel during the first appeal and the remand hearing. She is now represented by different counsel on appeal.

and physical environment would likely have on a child, and factor (H), which addresses whether a child has created a healthy parental attachment with someone other than the parent, to weigh in favor of termination. Given the amount of time that the Child had been in Grandparents' home and the evidence presented concerning Grandparents' close relationship with and care for the Child, we agree with the trial court's findings that factors (A), (B), and (H) weighed in favor of termination.

However, within its analysis of factor (A), the trial court tempered its findings by noting that the GAL had "strongly oppos[ed] termination" and stating that Mother "deserves a chance." During oral argument, Grandparents' counsel urged that these last findings were inconsistent with the court's prior findings regarding factor (5). Upon review, we discern no inconsistency because the evidence also supported the court's simultaneous finding that Mother had successfully presented evidence of her own bond with the Child. Therefore, the court did not err by finding that factor (A), with its focus on stability and continuity, weighed in favor of termination. Furthermore, the court correctly determined that this factor did not "mandate" termination considering the progress that Mother had made.

The trial court also found that factor (J)—whether the parent's home would be safe and beneficial for the child—weighed in favor of terminating Mother's parental rights. Comparing factor (J) to "old factor" (7), the court stated that its findings were the same as in its prior order for factor (7). The court had found regarding factor (7) that Mother's home was "believed to be appropriate" at the time of trial while noting that "there [had] been issues in the past with [Mother's] home." In its memorandum opinion incorporated into the prior order, the court explained:

> There is a lot in Number Seven. First of all, [Mother's] home is unknown at the present time. She has moved. She says it is good. The home that was last visited by the Guardian Ad Litem was good. There was no criminal activity that the Court heard about in the last home or the present home. Prior to that there was criminal activity in the home and there was use of controlled substances and Facebook braggadocio about parties indicating the use of alcohol. There is no proof that rendered [Mother] consistently unable to care for the child in a safe and stable manner. That one weighs in favor of termination but only slightly.

Grandparents argue that the trial court should have determined factor (J) to weigh heavily in favor of termination rather than "only slightly." In support of this postulate, Grandparents rely primarily on testimony indicating the poor environmental condition of Mother's apartment during the time that Mother's former boyfriend, C.M., resided there. The trial court noted these concerns but also considered Mother's progress in establishing

a safe and healthy home. Grandparents presented no evidence of substance abuse occurring in Mother's living situation since she separated herself from C.M. During trial, Mother testified that she had been residing with her current paramour, J.P., in an apartment in Rogersville for approximately two months and stated they had lived with J.P.'s mother prior to that. Mother relayed that J.P. and she planned to be married and that J.P. was acting as a father figure to K.M. The trial court specifically found that J.P. appeared to be "a positive influence" in Mother's life. During the remand hearing, Grandmother testified that she thought Mother was residing with her current boyfriend's mother in either Morristown or Telford, but Grandparents presented no additional proof regarding Mother's living situation since the January 2022 trial. We determine that the evidence preponderates in favor of the trial court's findings as to factor (J).

Factor (N), which focuses on whether the parent or someone frequenting the parent's home has shown abuse or neglect, also involves the safety of the parent's home. In weighing factor (N) in favor of termination, the trial court found it to be "similar to the old factor" (6). Concerning factor six, the court had found in its initial memorandum opinion that Mother had "shown neglect but she, according to some of the witnesses, has made a strong come back." However, the court also found a collective exhibit of photographs of the Child, presented by Grandparents, to be "somewhat disturbing," stating:

> I can't make a specific finding of any brutality or physical abuse but there are an awful lot of bumps and bruises there it looks to me like which is disturbing. I think all parties agree that [C.M.] created a bad home environment for the mother and the child. He is out of the picture now and I think these pictures go back to that. That, I think, would weigh[] in favor of termination.

We agree with the trial court regarding this observation and find no error in the court's consideration of Mother's past history of demonstrating neglect to a varying degree in support of its finding that factor (N) weighed in favor of termination.

The trial court also found that factor (S), whether the parent had paid child support, weighed in favor of termination. We determined in *Liberty I* that Mother had failed to financially support the Child in the four months preceding the filing of the initial petition. *Liberty I*, 2023 WL 2681897, at *8. Additionally, Mother acknowledged at trial that she had not provided support for the Child to Grandparents in the interim between the petition's filing and trial. On remand, Mother did not refute Grandmother's testimony that Mother had provided only a few small gifts for the Child but no monetary support to Grandparents since the termination trial. We agree with the trial court's finding that factor (S) also weighed in favor of terminating Mother's parental rights.

In contrast, the trial court found that factors (C), (D), (E), (F), (G), (I), (K), (M), (O), (P), (Q), (R), and (T) weighed against terminating Mother's parental rights to the Child. Regarding factor (C)—whether the parent had demonstrated continuity and stability in meeting the child's needs—the trial court found that although this factor would have weighed in favor of termination in the past, Mother had "made such great progress" by the time of trial that "the factor no longer weighs in favor of termination." In arguing that the trial court erred in weighing this factor against termination, Grandparents again focus in part on the condition of Mother's apartment when C.M. resided there. Additionally, Grandparents assert that Mother had not demonstrated continuity and stability because she had failed to complete several recommendations made in an October 2018 psychological assessment conducted by Omni Community Health and had not completed a psychological evaluation she had been ordered to undergo in the juvenile court's February 2020 *ex parte* order addressing visitation. At trial, Mother acknowledged that she did not remember having been ordered to undergo psychological testing in the February 2020 order, which had directed testing for both parents.

As to the Omni Community Health assessment recommendations, Grandparents cite Mother's testimony that the Kingsport Frontier Health office closed Mother's individual counseling case due to Mother's no-shows to appointments and that Mother did not complete family therapy, a medication management program, or parenting skills training. However, Mother testified that she had completed sessions of individual therapy through Frontier Health in Rogersville, allowing the Kingsport location to close her file at that location only. She further testified that (1) she had not attended family therapy because she was no longer with Father, (2) her counselor monitored the medication she was prescribed, and (3) she was never scheduled for parenting skills training. We determine that in considering this factor, the trial court properly reviewed what it found to be Mother's successful improvement in continuity and stability, rather than reviewing whether Mother had been compliant with every recommendation. The trial court's findings as to factor (C) are supported by a preponderance of the evidence.

Factors (D) and (E) are related in that they address the relationship between parent and child. In finding that factor (D)—whether the parent and child have a secure and healthy parental attachment—weighed against termination, the trial court found that Mother's relationship with the Child was "close and loving." However, the court also found that Mother's relationship was as "more of a friend" or a sister to the Child than a parent, and Grandparents argue that under this finding, the factor should have weighed in favor of termination. We disagree. The court appropriately considered the Child's close parental relationship with Grandparents under other factors. Factor (D) addresses the Child's relationship with the parent whose rights are at risk. This factor questions not only whether the parent and Child have a secure and healthy parental attachment, but also whether there is a reasonable expectation that the parent can create such an attachment.

Given the significant bond that Mother has managed to maintain with the Child despite their separate living situations, we determine that the evidence preponderates in favor of the court's conclusion that factor (D) weighs against termination.

Grandparents also argue that the trial court erred in finding that factor (E)—whether the parent has maintained regular visitation or contact with the child and used visitation to cultivate a relationship—weighed against termination. They cite Grandmother's testimony at trial that Mother missed several visits and sometimes failed to call ahead when cancelling. Grandmother testified that Mother had missed a few visits, particularly some Saturday visits before the visitation days were changed to mid-week and particularly when K.M. (Mother's younger daughter) had been ill. However, Grandmother also acknowledged that Mother generally had "been pretty good at keeping the visits." During trial, Grandmother reported that Mother would sometimes substitute a video call with the Child for a visit, and she acknowledged that she and Mother cooperated to utilize video calls for Mother to visit with the Child during the COVID-19 pandemic. Grandmother also acknowledged that Mother had visited consistently enough with the Child that Grandparents did not allege abandonment through failure to visit as a statutory ground for termination. Ms. Burke testified that Mother "kept up all of her visitations, and she was always looking for additional." For her part, Mother testified during trial that she had maintained a relationship with the Child through visits both in person and via video telephone calls whenever possible.

Grandparents also rely on Grandmother's testimony during the remand hearing that Mother had visited with the Child only "sporadically" since the January 2022 trial. Grandmother explained that Mother was scheduled to have supervised visitation on Monday and Tuesday afternoons. Grandmother stated that after trial, Mother visited "kind of regularly and then it kind of tapered off." According to Grandmother, "[t]here were times when [Mother] said that she was sick or her kids were sick," and "[t]here were a couple of times when [the Child] was sick and [Mother] didn't want to expose herself or her kids to [the Child]."[5] Grandmother testified that Mother had visited the Child on September 22, 2022, but did not visit again until Christmas Eve of 2022, and then not again until the Child's birthday in June 2023. Grandmother acknowledged, however, that for the time period between September 22 and December 24, 2022, Mother had informed Grandmother that Mother was in Pennsylvania with her ill father.

Grandmother also acknowledged that there had been occasions when Mother had requested that Grandmother bring the Child to Morristown for a visit but that Grandmother had refused to drive that far. Grandmother stated that Grandparents had compromised and

---

[5] During her testimony on remand, Grandmother repeatedly referred to Mother as having "her kids" with her during visits with the Child. It is not clear from the record why Mother was caring for more than one child (K.M.) during this time period.

- 21 -

brought the Child to Rogersville to visit with Mother. For the most part, visits had occurred at Grandparents' home in Church Hill, and Grandmother testified that visits had also occurred during a Fourth of July parade and at the community swimming pool in Rogersville. Grandmother admitted that when Mother contacted her regarding her desire to take the Child to the Knoxville Zoo, Grandmother had informed Mother that she would have to pay the entrance fee for the grandparent supervising the visit and plan their trip to Knoxville. That trip did not occur. Grandmother further relayed that Mother had arranged for the local fire department to hide Easter eggs in Grandparents' yard for the Child.

The trial court found that the additional testimony regarding visitation since the termination trial did not change its prior findings. Although we are concerned by Grandmother's testimony depicting months without an in-person visit between Mother and the Child in late 2022 and early 2023, we determine that the totality of the evidence preponderates in favor of the trial court's finding that Factor (E) weighs against terminating Mother's parental rights. As the language of this factor emphasizes, Mother utilized visitation and other contact with the Child to cultivate a positive relationship with the Child. Grandmother acknowledged that the Child enjoyed the visits with Mother and was sad to see her leave. Grandmother qualified this testimony by stating that the Child had a tendency to cry whenever anyone said good-bye. Despite this qualification, the evidence demonstrates that Mother had continued to visit the Child throughout these proceedings and maintained a significant relationship with her.

Factor (I) also concerns the Child's relationships, but it involves relationships with other people, including biological or foster siblings, rather than the parents or caregivers, who were Grandparents in this case. Undisputed testimony at trial demonstrated that the Child had an emotionally significant relationship with her aunt, B.T., who resided with Grandparents and whom the Child called "Sissy." On the other hand, Mother testified that the Child had a sibling relationship with her half-sister, K.M., and Grandmother testified on remand that the Child enjoyed time spent with K.M. when Mother brought K.M. while visiting the Child. In finding that this factor weighed against termination, the trial court stated that Grandparents would be "in the child's life in some form or fashion even if termination does not occur." This finding applies to one part of factor (I) in that with Grandparents in her life, the Child will have access to information about her paternal heritage, but the court did not make findings regarding the Child's relationship with persons other than Mother and Grandparents within its analysis of factor (I). In analyzing the old factor (5) and applying that to factor (B), the court did note that the Child maintained a close relationship with B.T. when determining that a change of caretakers "could have a great and upsetting effect" on the Child. Considering the Child's relationship with B.T. in Grandparents' household, relationship with K.M. in Mother's household, and need for access to information about her heritage on both sides of her family, we conclude that factor (I) weighs neither for nor against termination of Mother's parental rights. However, insofar

as the trial court erred in weighing the factor entirely against termination, we determine the error to be harmless due to the neutrality of the factor in this case.

Factors (F) and (G) relate to the Child's previous experiences in the parent's home and any trauma resulting from those experiences. Here, the trial court found that factor (F) (whether the child fears living in the parent's home) and factor (G) (whether the parent, the parent's home, or others living in the parent's home trigger or exacerbate traumatic experiences) both weighed against termination. The court did not explain these findings but appears to have weighed the factors against termination because the Child had never lived in Mother's home and so had not experienced fear or trauma there. Grandparents contend that the court should have found both factors to be inapplicable. They do not present any authority in support of this argument.

This Court has recently examined the applicability of factors (F) and (G) when the child has never lived in the parent's home or when no evidence concerning the factors has been presented at trial. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025). The mother in *Colten* conceded that the child had not had contact with her since he was removed from her custody shortly after birth, but she argued that the trial court had erred in finding factor (F) to be inapplicable because the fact that the child did not recognize her would mean that he was not fearful of living in her home. *Id.* at *9. The *Colten* Court noted that this Court had affirmed the trial court's finding that the two factors were neutral in *In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at *11 (Tenn. Ct. App. July 17, 2024), when the mother had argued that factors (F) and (G) "should have weighed in her favor in the absence of proof that the child at issue was fearful." *Id.* (also citing *In re Azelea B.*, No. M2023-00656-COA-R3-PT, 2024 WL 657652, at *23 (Tenn. Ct. App. Feb. 16, 2024); *In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at *11 (Tenn. Ct. App. May 16, 2023)). Summarizing case law regarding factors (F) and (G) since the enactment of the current best interest factors, this Court delineated:

> In another case, we deemed factor (F) "inapplicable" where a child had never lived in the parental home. *See In re Tayla R.*, No. M2024-00248-COA-R3-PT, 2024 WL 4950106, at *21 (Tenn. Ct. App. Dec. 3, 2024) ("DCS concedes that factor (F), regarding a child's fear of living in the parental home, is inapplicable since the Child never lived in Mother and Legal Father's home. For their part, Foster Parents argue that factor (F) applies and weighs in favor of termination. We agree with DCS as to the inapplicability of factor (F)[.]"). We have deemed factor (F) inapplicable in many other cases as well. *See, e.g., In re Lilah G.*, No. E2023-01425-COA-R3-PT, 2024 WL 3825077, at *10 (Tenn. Ct. App. Aug. 15, 2024) (agreeing with the trial court that factor (F) did not apply because there was no proof

regarding it presented at trial); *In re Elizabeth Y.*, 2024 WL 3738701, at *15 (noting that the trial court "omitted any reference" to factor (F) presumably finding it inapplicable, and agreeing that it "would weigh neither for nor against termination" because the child never resided in the home); *In re Logan F.*, No. M2023-01280-COA-R3-PT, 2024 WL 3534932, at *12 (Tenn. Ct. App. July 25, 2024) (finding factor (F) inapplicable where the court heard no testimony regarding whether the child would be fearful of living in the home); *In re Quentin G.*, 2024 WL 3324105, at *7 (same); *In re Zoey O.*, No. E2022-00500-COA-R3-PT, 2023 WL 3222699, at *14 (Tenn. Ct. App. May 3, 2023) ("The trial court also found that the factors set forth in Tennessee Code Annotated section 36-1-113(i)(1)(F) and (G) do not apply in the present case. The record supports these findings."); *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at *23 (Tenn. Ct. App. Nov. 10, 2022) ("Like the juvenile court, we find that factors (F), (G), and (S) are inapplicable. There was only one incident at an in-person visit at Mother's home which resulted in Joseph becoming confused and upset. There was no evidence that Joseph would fear living in Mother's home[.]"); *but see In re Ethan W.*, No. E2024-00318-COA-R3-PT, 2024 WL 4600451, at *19 (Tenn. Ct. App. Oct. 29, 2024) (concluding that factor (F) weighed against termination where there was no proof regarding that factor); *In re Freddy P.*, No. E2023-00042-COA-R3-PT, 2024 WL 660195, at *12 (Tenn. Ct. App. Feb. 16, 2024) ("there was no proof as to whether the child was fearful of living in Mother's home, which weighs against termination"); *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) ("DCS's failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable").

*In re Colten B.*, 2025 WL 252663, at *10. The *Colten* Court deemed factor (F) neutral in that case, but the Court also determined that because the mother had demonstrated no relationship at all with the child, any mislabeling of this single factor represented harmless error. *Id.* at *10.

In the case at bar, although the Child had never resided in Mother's home, the Child had been in Mother's home up to February 2020 when Mother had exercised some visitation in her home. We recognize that Mother's home situation at that time was found to be unstable by the juvenile court and was the cause of the *ex parte* order limiting Mother's visitation to be supervised away from C.M.'s presence. However, unlike the situation in *Colten*, Mother has since maintained a significant relationship with the Child. Grandparents presented no evidence that the Child was fearful of living with Mother or that Mother's presence triggered or exacerbated a feeling of trauma in the Child. Therefore, we determine that under the circumstances of this case, the evidence preponderates in favor

of the trial court's findings that factors (F) and (G) weighed against termination. *See In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (determining that a factor in the best interest analysis that is "not proven to weigh in favor of termination . . . weighs against termination.").

In finding that factor (K)—whether the parent has taken advantage of available services to make a lasting adjustment of circumstances—weighed against termination, the trial court adopted its previous findings regarding the old factor (2), wherein it had determined that Mother had "made reasonable adjustments and progress based on available services." Ms. Burke testified that Mother had consistently cooperated with CASA and DCS and that Ms. Burke was attempting to obtain further services to assist Mother when the termination and adoption petition was filed, causing transfer of the case from juvenile court to the trial court. As with factor (C) concerning Mother's demonstration of continuity and stability, we find that in considering factor (K), the trial court properly reviewed what it found to be Mother's successful improvement based on available services rather than whether she had complied with every recommendation made in the juvenile court's visitation order. The trial court's findings as to factor (K) are supported by a preponderance of the evidence.

Factors (M), (P), (Q), and (R) all relate to the parent's actions to meet the child's needs and create a safe home for the child, including (M), demonstrating a sense of urgency in seeking custody of the child or addressing circumstances that made an award of custody unsafe; (P), demonstrating an understanding of the basic and specific needs of the child; (Q), demonstrating an ability and commitment to creating a home that meets the child's needs; and (R), providing a physical environment in the parent's home that is healthy and safe for the child. The trial court found that all four of these factors "presently weigh[] against termination." The court did not explain these findings further in its order on remand. However, in its memorandum opinion, incorporated by reference into the dismissal order, the court found that Mother had made an adjustment in circumstance, conduct, or conditions that made it safe for the Child to be in her home.

In making this finding, the trial court cited the testimony of Ms. Burke and Mother. Ms. Burke testified that she had been assigned to the Child's case in October 2019. She reported that in January 2020, she was present for drug screening of C.M. and that he tested positive for marijuana. During this timeframe, Mother sometimes visited with the Child in her own home, and Mother was pregnant with K.M. Ms. Burke stated that at that time, Mother's apartment was cluttered and unkept, with old foodstuffs lying around, including milk in a child's cup that had separated. Ms. Burke further reported that during an unannounced visit to Mother's home on February 8, 2020, the Child was present, and the apartment was in disarray with a "filthy" bedroom and bathroom. Ms. Burke observed powdery white residue on a coffee table but acknowledged that this substance was never

- 25 -

tested and that she did not know what it was. Ms. Burke testified that during these early observations in January and February 2020, she had concerns that Mother's home was an unsafe environment for the Child.

However, Ms. Burke further testified that many of the safety concerns related to Mother's home in early 2020 involved the presence of C.M., from whom Mother subsequently separated herself. In this regard, Mother testified that C.M. was on "hard drugs" and that he initially refused to leave Mother's apartment despite her repeatedly telling him to vacate. Ms. Burke reported that by the time Grandparents filed the termination petition in April 2020, Mother had remedied the conditions that led to the Child's removal from her home. The record indicates that following K.M.'s birth in March 2020, the juvenile court adjudicated K.M. dependent and neglected as to her father, C.M., awarding full custody of K.M. to Mother. The juvenile court also directed that C.M. was to have no contact with K.M., and as the trial court noted in the instant action, C.M. was no longer involved in Mother's life at the time of trial. Grandparents have not refuted Mother's testimony that she never failed a drug screen during DCS's involvement with the Child. Additionally, Ms. Burke testified that despite DCS's involvement with the family, no action had ever been taken to remove K.M. from Mother's custody. In its memorandum opinion, the trial court also emphasized the GAL's statement to the court that Mother had made a successful adjustment in her circumstances.

As to Mother's living situation at the time of trial, the trial court appears to have credited Mother's testimony regarding her establishment of a home in Rogersville with J.P. Apart from this testimony, as well as Ms. Burke's testimony that Mother had experienced no further problems with the safety of her home environment after C.M.'s departure, there is very little evidence in the record concerning Mother's current home environment. We emphasize, as did the trial court in its initial dismissal order, that it was Grandparents' burden to establish clear and convincing evidence that the termination of Mother's parental rights would be in the Child's best interest. *See In re Bernard T.*, 319 S.W.3d at 596 ("[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence."). Considering the evidence supporting the trial court's finding that Mother had corrected her home situation at the time of trial and the urgency with which Mother did so after the February 2020 incident, we conclude that the evidence supports the court's findings that factors (M), (Q), and (R) all weigh against terminating Mother's parental rights.

Regarding the element of factor (P) that involves the parent's demonstrated understanding of the specific needs of the child, Grandparents contend that the trial court should have found that Grandmother's testimony on remand concerning the Child's specific needs required weighing this factor in favor of termination. Grandmother testified that the Child had "some sensory issues" and was on a waiting list to be tested for the

- 26 -

"Autism spectrum." She reported that the Child attended speech therapy weekly and had been referred for occupational therapy and physical therapy. According to Grandmother, she had taken the Child to all of her medical appointments, and Mother had not attended any of those appointments. Grandmother stated: "I do tell [Mother] when [the Child] goes to the doctor and I tell her what the doctor says and what the plan is." However, Grandmother acknowledged that sometimes she has not informed Mother concerning this information until after the appointment is completed. Grandmother also acknowledged that Mother had checked with her to see if the Child needed any school supplies, but Grandmother stated that she and B.T. had already bought the supplies.

As we have noted, the trial court determined that none of the evidence heard on remand, which was limited to Grandmother's testimony, affected its previous findings. Factor (P) inquires whether "the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive." There is no evidence in the record that Mother lacks understanding regarding the Child's basic needs. During trial, Mother testified that Grandmother sometimes informs her about the Child's medical appointments but that she always has to ask. Although Mother's access to information regarding the Child's special needs may have been limited by Grandmother, Mother has not presented evidence demonstrating that she fully understands the Child's specific needs, and she has not addressed factor (P) on appeal. We therefore determine that the trial court erred in weighing factor (P) entirely against termination of Mother's parental rights and deem it to weigh slightly in favor of termination.

The trial court also weighed factor (O)—whether the parent has ever provided safe and stable care for the Child or any child—against terminating Mother's parental rights. In arguing that the court erred in weighing this factor, Grandparents again emphasize the condition of Mother's home when C.M. resided with her, Mother's failure to complete all recommendations from her assessments, and Mother's immaturity when she initially left the Child in Grandparents' care. However, the trial court found that since the time period when she had lived with C.M., Mother had made significant progress in her ability to provide a safe and stable home for the Child. Additionally, this factor asks whether the parent has provided safe and stable care for any child. The record indicates that Mother has maintained consistent custody of K.M. since her birth in March 2020. At that point, DCS was involved in the juvenile court case, and no action was brought against Mother concerning K.M. The evidence supports the trial court's finding that factor (O) weighed against terminating Mother's parental rights to the Child.

The trial court further found that factor (T)—whether the parent's mental or emotional fitness would be detrimental to the Child or prevent the parent from providing safe and stable care—weighed against terminating Mother's parental rights. The court stated in its dismissal order that "[t]his factor presently weighs against termination" without

further explanation. We note that the language in factor (T), except for substitution of the word, "fitness," in place of "status," is substantively the same as the language in factor (8) of the statute's prior version. As to factor eight, the trial court found in its initial dismissal order that Mother's mental and emotional status was "immature." The court explained in its memorandum opinion:

> The Court heard proof that the mother is immature. In her previous relationship prior to [J.P.] that there was a lot of hostility and perhaps some domestic violence. There was a lot of fighting, maybe, that didn't rise to the level of domestic violence. In her present home the Court heard none of that. In fact, [J.P.] . . . I didn't get to meet him but he sounded like, perhaps, a person who is a positive influence in her life and also in her children's lives. With regard to her mental and emotional status I see immaturity. She moves around a lot maybe due to that immaturity. That kind of has gotten in the way of her stability. <u>If that weighs in favor of termination it would only be slightly</u> though in the Court's mind because there is a lot of proof in the last year in the delay really of this matter that she has made a pretty strong come back.

(Emphasis added.)

In addition to the trial court's finding of Mother's "immaturity," Grandparents reference Ms. Burke's testimony that in a March 2020 report, she had written the following summary in pertinent part:

> [Mother] and [Father] have exhibited [a] high level of immaturity, impulsivity, and poor decision making. Though neither would intentionally cause harm to [the Child], neither exhibits the ability to care for her on a daily basis. Their interactions with one another are mostly aggressive and resemble that of young teenagers.

However, when questioned regarding whether Mother had subsequently "adequately and promptly tr[ied] to address the issues that had been identified," Ms. Burke answered in the affirmative, adding that [C.M.] had been "removed from the home" and that Father had "moved out of state." Although Grandmother testified that she had heard Mother say she had "a lot of anxiety" and was "bipolar," Grandparents presented no evidence of a diagnosed mental disorder attributable to Mother.

Considering the court's determination that none of its factual findings were changed by the evidence heard on remand, we discern an inconsistency between the court's finding in its initial order that factor (8) may have weighed "slightly" in favor of termination and

its subsequent finding that factor (T) weighed against termination. However, we determine this inconsistency to constitute harmless error. The evidence supports the court's finding regarding Mother's emotional immaturity but also supports the court's finding that she had "made a pretty strong come back." Moreover, no proof was presented of a mental disorder that would prevent Mother from providing safe and stable care to the Child. As the court initially found regarding factor (8), we determine that insofar as factor (T) weighs in favor of termination, it does so only slightly.

To summarize, we affirm the trial court's findings as to all factors except factor (I), which we have determined to be neutral rather than weighing against termination, and factors (P) and (T), which we have determined weigh slightly in favor of termination rather than against. However, upon careful review, we conclude that any errors in the trial court's consideration of factors (I), (P), and (T) were harmless. With particular consideration of the meaningful relationship between Mother and the Child found by the trial court, we agree with the trial court's conclusion that Grandparents have failed to prove by clear and convincing evidence that termination of Mother's parental rights is in the Child's best interest. *See In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *30 (Tenn. Ct. App. July 21, 2021 ("Critically, the existence of a meaningful relationship often strongly weighs against termination."). We find that "[t]he proof in this record shows that Mother has accomplished something rarely seen in parental termination cases—she established that '[n]ot all parental misconduct is irredeemable.'" *See In re Scarlett F.*, No. W2021-01292-COA-R3-PT, 2022 WL 4286927, at *15 (Tenn. Ct. App. Sept. 16, 2022), *perm. app. denied* (Tenn. Dec. 7, 2022) (quoting *In re Audrey S.*, 182 S.W.3d at 877)). The trial court did not err in finding that the best interest of the Child weighed against termination and therefore did not err in dismissing Grandparents' petition.

We note that in its memorandum opinion, the trial court stated that it was dismissing the termination petition "reluctantly," explaining in pertinent part:

[Mother] . . . you have given yourself this chance and the proof I have heard is giving you this chance. If this is one of those where you just worked a little bit and got yourself looking okay for the day of Court and happened to have a good lawyer on the day you came to Court and all that, you know, it's not going to last. That little girl is paramount to this Court. That is why I say I do this reluctantly because I know that she is in a safe home. I know she is in a stable home. I know she is in a place I don't have to go home tonight and worry about her. Take your lawyer's advice. Continue to make progress. Do what you are told to do in Juvenile Court and I will yield at this time to the wishes of the Guardian Ad Litem and the proof that I have heard and your position in the case.

As the trial court's comments indicate, dismissal of the termination petition was accompanied by a remand to the juvenile court for further proceedings. As in *Scarlett*, dismissal of the termination petition "does not mean that Mother immediately regains custody of the child or that she will ever regain custody." *See In re Scarlett F.*, 2022 WL 4286927, at *16. It "merely means" that Grandparents "failed to meet their burden of proof" to terminate Mother's parental rights. *See id.*

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for collection of costs below, enforcement of the trial court's order dismissing Grandparents' petition, and subsequent remand to the juvenile court's protective jurisdiction. Costs on appeal are assessed to the appellants, Julie T. and Timothy T.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE